FILED

2009 Nov-30  PM 05:07
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| SHIRLEY BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-07-S-2119-NE |
| | ) | |
| JACOBS ENGINEERING, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Shirley Brown, asserts race and gender discrimination claims against her former employer, Jacobs Engineering, Inc. ("Jacobs" or "defendant"), pursuant to Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e *et seq.*; 42 U.S.C. § 1981; and 42 U.S.C. § 1981a.  Plaintiff also asserts a supplemental state law claim for "Third Party Beneficiary Breach of Contract."  The case presently is before the court on defendant's motion for summary judgment on all of plaintiff's claims.   Upon consideration of the motion, the briefs, and the evidentiary submissions, the court concludes the motion is due to be granted.

## I.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).[1]  In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  Inferences in favor of the non-moving party are not unqualified, however.  "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983).  Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

---

[1] Rule 56 was recently amended in conjunction with a general overhaul of the Federal Rules of Civil Procedure.  The Advisory Committee was careful to note, however, that the changes "are intended to be *stylistic only*."  Adv. Comm. Notes to Fed. R. Civ. P. 56 (2007 Amends.) (emphasis supplied).  Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis supplied). *See also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## II.  SUMMARY OF FACTS

On April 2, 2001, plaintiff, Shirley Brown, an African-American female, was hired by defendant Jacobs Engineering Group, Inc. ("Jacobs"), as the Human Resources Director for Jacobs's Huntsville, Alabama location.[2]  Lon Miller, the General Manager on the contract for which plaintiff worked, made the decision to hire plaintiff.[3]  As Human Resources Director, plaintiff was in charge of recruiting, advertising, human resources policies and procedures, compensation policies and issues, employee relations, temporary staffing, training, diversity, and sexual harassment training.[4]  She also was charged with employee discipline and enforcing workplace rules.[5]

Plaintiff initially performed well in this position, particularly in the area of

---

[2]Doc. no. 42 (plaintiff's evidentiary submission), Exhibit 1 (Declaration of Shirley Brown), at ¶ 4.

[3]*Id.* at ¶ 5.

[4]*Id.* at ¶7.

[5]*Id.* at ¶ 25.

recruiting.  Plaintiff was able to reduce the average time period for filling an open

position from sixty days to twenty or fewer days — an achievement that had long

been a goal of the company.[6]

In July of 2004, plaintiff disciplined Helen Jones, an African-American female

HR employee, for problems with lateness, low productivity, low volume of work, and

lack of knowledge about her job.[7]  On August 18, 2004, Ms. Jones filed a complaint

about plaintiff with Lee Whitham, defendant's corporate Director of Human

Resources, challenging whether the disciplinary action was legitimate.[8]  Whitham

assigned Tonya Brannon, an employee of the corporate Human Resources

Department, to investigate the complaint.[9]  In her report of the investigation, Brannon

found that four company policies had been violated during the process of plaintiff's

disciplinary action against Jones.  Brannon also stated that her

> investigation further proved that evidence collected disagreed with two
> issues contained in the performance correction notice issued by Ms.
> Brown.  The investigation uncovered the fact that within the Human
> Resources department at the MSFC Group, there is a definite problem
> that must be addressed.  Evidence further showed that every employee
> hired into the HR department with the exception of Ms. Helen Jones had

---

[6]Doc. no. 32 (defendant's evidentiary submission), Exhibit 4 (Deposition of Lon Miller), at 90.

[7]Defendant's evidentiary submission, Exhibit A (Deposition of Shirley Brown), at 168-71.

[8]Defendant's evidentiary submission, Exhibit E (Deposition of Lee Whitham), at 35-36.  *See also* Exhibit 16 to Brown Deposition.

[9]Whitham Deposition, at 36.

left the company while being under the supervision of Ms. Brown. The investigation proved that all of the employees within the HR department between the dates of 2001 to present left due to the adverse treatment received from Ms. Brown.[10]

Brannon recommended that the performance correction notice that plaintiff had issued to Ms. Jones should be rewritten, and that plaintiff and Ms. Jones should be separated at work because of their interpersonal problems. Brannon also stated that,

> [b]ecause the working environment has been dreadful and very stressful for employees within the MSFC [*i.e.,* Marshall Space Flight Center] HR Department, I recommend Ms. Brown be temporarily removed from the job pending counseling and training on how to interact with others. I also recommend anger management training and communication training be made mandatory for Ms. Brown.[11]

Also in 2004, plaintiff was investigated due to complaints by an employee, Traci Johnson, who accused plaintiff of forcing her to change negative statements she made about plaintiff in an exit interview on August 3, 2004.[12] Plaintiff denies requiring Johnson to change the statements made in her exit interview.[13] Despite that denial, the unidentified individual who investigated Ms. Johnson's complaint stated:

> The investigative process proved that based upon all of the interviews conducted; [sic] there is definitely a problem that needs to be addressed. The Human Resources department should be looked upon as a place employees can go to feel secure, to feel that they will be

---

[10]Brown Deposition, Exhibit 16, at 5.

[11]*Id.*

[12]Brown Deposition, at Exhibit 25.

[13]Brown Deposition, at 188-89.

treated fairly.  When the Human Resources Department becomes the place of injustice and is therefore considered a joke and the place not to work then there is a problem that must be addressed.

This complaint involves a Human Resources Manager who has been accused of making demeaning comments to her staff as well as other employees.  This was evident when examining the turnover rate within the HR department.  Every employee within the HR department with the exception of Ms. Jones, has left the department.  All of them stated that their reason for leaving was due to the behavior, comments, and management style of Ms. Brown.

All of her previous employees stated that "you never know which side of Ms. Brown you were going to encounter from day to day.  Sometimes she could be very nice and at other times, she would be unbearable to work with.  There were times when she was very helpful and even nice.  Then others nothing could be done right or good enough to please her.  It was like working for Dr. Jekyl and Mr. Hyde."

The investigation also proved that making Ms. Johnson redo her exit interview based upon her review and recommendation was wrong.  This conflicts with the practice that is followed by the company.  Exit interviews are used to gather information from terminating employees and use this information to improve our internal processes.

The investigation also proved that several employees have spoken to Mr. Miller regarding the actions and conduct of Ms. Brown.  Consequently, no action was taken by Mr. Miller after having heard the concerns.  His actions resulted in the determent of other employees coming forward and discussing the treatment received by Ms. Brown.[14]

The investigator recommended the following:

The investigation proved that there were several employees who have felt the same if not worst [sic] wrath of Ms. Brown.  This was not an isolated incident, but rather several incidents.  There were several

_____

[14]Brown Deposition, Exhibit 25, at 5.

employees who were hurt by Ms. Brown.

> Because this is a HR Mgr who has been trained in how to handle people, the fact that this individual disregards professionalism and self seeks is appalling.  She has made the work environment dreadful and very stressful for several employees within the MSFC HR Department[.] I recommend Ms. Brown be temporarily removed from the job pending counseling and training on how to interact with others.  I also recommend anger management training and communication training be made mandatory for Ms. Brown.[15]

As a result of these investigation findings, Linda Rittenhouse, the in-house corporate attorney for Jacobs, met with plaintiff on October 4, 2004, to advise her of what actions she would need to take to improve her performance.[16]

Defendant was awarded a contract with the National Aeronautics and Space Administration ("NASA") in 2005.  It is customary for a company bidding on a NASA contract to include a list of "key personnel" or "key positions" in their bid proposal.  In most cases, the individuals listed on the proposal are the same individuals who end up occupying those "key positions" if the contract is awarded.[17] Miller decided to list plaintiff as one of the key personnel on the NASA contract bid, along with Lon Miller, the General Manager, Randy Lycans, the Deputy General Manager, Mike Weibert, the Safety & Quality Manager, Jim Shelton, the Business

---

[15]*Id.*

[16]Brown Deposition, at 154-63.

[17]Miller Deposition, at 10-11.

Manager, Jack Stockdale, the Engineering Director, Dr. Jan Davis, the Programs & Projects Director, Dr. Ron Belz, the Science & Technology Director, and Norm Brown, the Space Transportation Systems Director.[18]   Miller testified that it was unusual for a Human Resources Director to be bid in a "key position," but that he nonetheless decided to bid plaintiff as a "key manager" because of her demonstrated success in recruiting.  Recruiting had been a problem for Jacobs in Huntsville in the past, and Miller wanted to demonstrate to NASA that Jacobs was making improvements in that area.[19]   Miller also made the decision despite knowing that plaintiff had been the subject of two employee complaints the year before.  Miller was willing to "accommodate" the problems plaintiff had been having, "hoping that eventually we would work them out, we could work through them."[20]  He soon came to realize, however, that "it was not going to work out" for plaintiff in the position of Human Resources Director.[21]

In early September of 2005, plaintiff decided to speak with Miller about some of the problems she was having with other Human Resources Personnel.   In preparation for the meeting, she drafted a document that bore the heading "Point of

---

[18]Brown Deposition, at Exhibit 34.

[19]Miller Deposition, at 13-14, 25.

[20]*Id.* at 25.

[21]*Id.*

Departure for Meeting."  In that document, she presented a timeline of her work history with defendant and detailed different work-related and interpersonal problems she had with five employees, Teresa Bell, "M. Grigsby," Kathy Hoefer, Amanda Berry, and "J. McCoy."[22]

Plaintiff and Miller met a second time on September 12, 2005.[23]   A memorandum plaintiff prepared in advance of that meeting indicated that she intended to continue to discuss with Miller her problems with the same employees they had discussed earlier in the month.[24]  Miller's notes from the meeting reflect that he told plaintiff that her group had more personnel issues than any other group at Jacobs; that, despite the fact that she was on the third generation of employees in her department, the department still could not come together as a team; that plaintiff often communicated with her subordinates in a condescending manner; and that plaintiff's management style was inappropriate for the type of business Jacobs conducts.  Miller recommended that plaintiff hold a private meeting with her staff in a neutral location, where everyone would be free to voice their concerns without fear of retaliation.[25] Plaintiff acknowledges that she and Miller discussed how her interactions with one

---

[22]Brown Deposition, at Exhibit 27.

[23]Brown Deposition, at 326.

[24]Brown Deposition, at Exhibit 35.

[25]Brown Deposition, at Exhibit 36.

particular employee might be considered condescending, but plaintiff otherwise disputes that she and Miller discussed the points listed in Miller's memorandum.[26]

In March of 2006, Miller was transferred to Texas, and Randy Lycans became the General Manager on defendant's NASA contract in Huntsville.[27]   On June 12, 2006, plaintiff complained to Lycans that employees in other departments had been spreading "gossip and dissension" about the Human Resources Department, and she informed Lycans that she was considering filing a grievance against some of those employees.[28]   Lycans passed plaintiff's complaint on to Lee Whitham and Linda Rittenhouse, defendants' corporate legal counsel, who assigned Steve Iapicco, the Labor Relations Manager from defendant's corporate office, to investigate the complaint.[29]

Iapicco was not told which, or how many, employees he should contact to conduct the investigation.  Instead, Whitham instructed him to interview plaintiff and "then see where the investigation led" him.[30]   Iapicco conducted his investigation over a period of approximately one week, and he interviewed twenty-seven or twenty-

---

[26]Brown Deposition, at 326-33.

[27]Miller Deposition, at 8.  *See also* defendant's evidentiary submission, Exhibit B (Deposition of Randal W. Lycans), at 11.

[28]Brown Deposition, at 345-47.  *See also id.* at Exhibit 39.

[29]Lycans Deposition, at 61-62; Whitham Deposition, at 42; defendant's evidentiary submission, Exhibit C (Deposition of Steven Iapicco), at 29.

[30]Iapicco Deposition, at 32.

eight witnesses, including both current and former employees of the Human Resources Department and other departments at Jacobs.[31]  Although the original purpose of the investigation was to address plaintiff's complaints that the Human Resources Department was being undermined, Iapicco received so many complaints about plaintiff during the course of his investigation that plaintiff ultimately became the subject of the investigation.[32]

Iapicco made the following findings:

> The investigation was to look into allegations of employees gossiping and instigating rumors about Shirley Brown, thus causing an undermining of her ability to manage the HR department.  Ms. Brown has a much different perception of the issues both past and present employees have relating to the ESTS HR group.  Ms. Brown feels she was brought into JS to be a change agent for the HR function.  Ms. Brown feels she has helped the HR department and its employees grow. She had identified the positions as "professional" and made promotions. She changed the reporting structure to the OGM.  Ms. Brown feels that most of the turnover in her group was based on either disgruntled employees that didn't want to work hard or the undermining of new employees with gossip and rumors primarily driven by Maxine Grigsby, Donna Hubert, Mark Grindle, and Jeremy Lambert.

> Through the remaining interviews a theme began to develop. There is gossip on the contract that is mostly related to the Business Group and HR Group.  It is not as wide spread as Ms. Brown perceives. The gossip relating to HR is based on the high turnover rate as well as the treatment of the employees (both present and former) in the HR group that work for Ms. Brown.

---

[31]*Id.* at 39.

[32]*Id.* at 57.

Other themes that were discovered during interviews include the following (all confirmed by different sources)

- Joke on the contract is, "How long will the new HR employee last?"

- Ms. Brown does not adhere to the JS motto of; [sic] Employees are our greatest asset.

- Ms. Brown does not treat her employees with respect that she treats employees at or above her level. [sic]   HR employees (past and present) reported being continuously berated and constantly being blamed for mistakes even if they were directed to perform something by Ms. Brown.

- Ms. Brown has put her hands (never in a manner to intentionally hurt) on several different employees.  This is inappropriate behavior for someone in Ms. Brown's position.

- Employees feel intimidated by Ms. Brown.  Several raised concerns of retaliation during interviews.

- Ms. Brown's peers feel she is incompetent.

- Ms. Brown is a very nice person outside of work.  Many employees felt they could be friends with her if they hadn't known her at work.

The treatment of HR personnel has not changed over time and is reflected in the continuing high turnover rate.  The reasons given by former employees for leaving the Company were consistent.  The current temp employees are not sure they would take a full-time position based on the behavior and treatment by Ms. Brown, which is the same as stated by the former employees.  The Company has lost some potentially good employees based on their treatment while employees under her management.

Ms. Brown may not be aware she treats her employees poorly.[33]

Iapicco offered the following recommendations:

The events of incidents concerning Ms. Brown [sic] have raised some areas of concern that should be addressed:

- Emphasize to all employees at ESTS that the Company has a 24-hour Integrity Hotline that can be used at any time to report issues if they feel unable to report through their normal reporting chain.

- Emphasize to all employees that gossip and rumors will no longer be tolerated. Managers will be held responsible for ensuring it does not take place.

In regard to the actions taken by Ms. Brown:

- She violated Company rules to include but not limited to: 9, 13, 14, 16, 23, and 25 and Harassment Policy 5-304 (see attached Policy 2710).

- She was trained and was responsible for enforcing Company Policies in which she violated [sic].

- She has put the Company in jeopardy for potential law suits by current and former employees based on her behavior.

- She has put the Company in jeopardy of damaging our relationship with our Teammate Companies.

Based on the information gathered, to include past behavior exhibited by Ms. Brown, it is concluded that Ms. Brown continues to violate Company Rules. Furthermore, based on the negative reputation in the ESTS Group of the management style of Ms. Brown, it is

---

[33]Brown Deposition, Exhibit 58, at 10-11.

concluded that training will not change the attitude of the workforce with dealing with Ms. Brown in the future.  It is recommended that Ms. Brown's employment be terminated.[34]

Iapicco also received reports that, in April of 2006, plaintiff had grabbed Donna Hubert, a female employee of the IT department, by the arm, leaving bruises.[35]  After completing his investigation, Iapicco did not return to plaintiff to ask for explanation or rebuttal of any of the other allegations he received.[36]

On August 31, 2006, plaintiff met with Lycans and Iapicco, who informed her

---

[34]*Id.* at 11.  Plaintiff points to several items from the written notes of Iapicco's investigation that allegedly suggest that he omitted from his findings several statements that would have been favorable to plaintiff.   The court acknowledges that Iapicco's eleven-page final report did not include (nor could it have included) every statement and other piece of information he gathered during his week-long investigation.  Even so, Iapicco's final report is a fair and balanced compilation of the assessments made in his notes.  The report includes both favorable and unfavorable comments about plaintiff.  The report also leaves unaddressed both favorable and unfavorable comments about plaintiff.  In short, Iapicco's report was not unreasonably biased against plaintiff, and the comments plaintiff claims were omitted are immaterial to both the report and to her claims in this case.  For example, plaintiff claims that Kathy Hoefer reported that her working relationship was "fine" at the time of the report.  Iapicco Deposition, Exhibit 3, at document bearing Bates Stamp No. 1422.  Iapicco explained, however, that Hoefer made that comment *after* she no longer reported directly to plaintiff.  Iapicco Deposition, at 90-91. Plaintiff also points out that Jack Stockdale stated during the investigation that he had occasional "heated" interactions with plaintiff, but that he was "not worried about it."  Iapicco Deposition, Exhibit 3, at document bearing Bates Stamp No. 1454.  However, Stockdale made that comment with regard to the slow processes in the Human Resources Department, not with regard to plaintiff's management style or reputation.  Iapicco Deposition, at 99-101.  Two other non-HR managers stated that the *performance* of the HR Department was good, without commenting on plaintiff's management style or the internal operations of the department.  *See* Iapicco Deposition, Exhibit 3, at document bearing Bates Stamp No. 1447.  Finally, Nicole Miller, a temp worker, stated that she did not feel intimidated by plaintiff.  Iapicco Deposition, Exhibit 3, at document bearing Bates Stamp No. 1405.  Despite that acknowledgment, Miller also stated that the HR Department had a lot of turnover, that plaintiff had communication problems, that there was a lot of gossip about the department, and that plaintiff is "never wrong" and could use some training.  *Id.*

[35]Iapicco Deposition, at 64-68.

[36]*Id.* at 76.

that her employment was terminated.[37]  During the meeting, Iapicco also shared with plaintiff several points he had compiled in a document entitled an "out-brief" summary of his investigation findings.  Generally, Iapicco informed plaintiff that his investigation had not substantiated her allegations of outside interference with her operation of the Human Resources Department, gossip about the Human Resources Department by other departments, and dissension within the Human Resources Department caused by employees Grigsby, Hubert, Grindle, and Lambert.  Instead, the investigation revealed that plaintiff had inappropriately touched employees, that there was a high turnover rate among employees in the Human Resources Department, that plaintiff engaged in inappropriate verbal behavior, and that the Human Resources Department had "failed to build a level of confidence" among its customers.[38]  Lycans testified that his decision to terminate plaintiff's employment was based upon Iapicco's investigation findings, as well as on his own personal experiences with and observations of plaintiff in the workplace.[39]  Lycans also sent plaintiff a letter officially conveying the termination decision.  The letter was dated September 5, 2006, and it stated:

> As discussed with you on August 31, 2006, based upon my

---

[37]Brown Deposition, at 386-94.

[38]Iapicco Deposition, at 176; Brown Deposition, Exhibit 59, at 1-2.

[39]Lycans Deposition, at 88-89, 194.

personal observations of your performance, both before and since I became the General Manager of the ESTS contract, I can no longer keep you on this contract as the Human Resources Manager. The findings of the internal investigation were indicative of the serious problems that have been on-going and for which decisive action is required.

This decision was not made without long, hard consideration. While there are multiple factors that led to our decision, your disregard for one of our core values — "People are our greatest asset" — was an important and contributing factor. In addition to continuing issues with dealing effectively with people, there have been errors in offer packages brought to the General Manager for approval and lost promotional paperwork for teammate employees. In addition, there has been high turnover, poor morale and poor performance of the Human Resources Department over an extended period of time. You have failed to recognize these problems and have been quick to place the blame on others. Due to poor management practices and the treatment of others in a manner that is inconsistent with company policies and values, there has been a loss of confidence in your ability to lead the Human Resources Department and contribute in the manner required on this contract.

You are relieved of your duties as of August 31, 2006, and in lieu of notice the Company will provide you with two (2) weeks pay. Your effective date of termination is September 16, 2006. Your final paycheck will include any accrued vacation balance, up to the policy limits. The IHO Benefits Office will provide you with information on your benefits continuation rights, including COBRA, by separate letter.

If you have any questions, please feel free to contact either me or Lee Whitham, HR Director.[40]

## Alleged Comparators

Mike Weibert, the Safety Manager on the NASA contract, was at the same

---

[40]Brown Deposition, at Exhibit 61.

level on the organizational chart as plaintiff, and he also was listed among the "key personnel" on the contract bid.[41]   Other employees complained that Weibert was uncooperative, abrasive, aggressive, and gruff, and that he lacked professionalism.[42] Lycans, however, described Weibert's management style as "passionate" and "not afraid to be vocal and to tell folks [what they] need to be doing."[43]   Weibert received training to address his management style, but he never was the subject of an internal investigation, and his employment was not terminated.[44]   The court does not find evidence of Mr. Weibert's race in the record.

Jack Stockdale, a white male Director of Engineering, also was listed as a "key manager" on the NASA contract bid.[45]   Other employees have described Stockdale as "gruff," "hard-charging," "driven," and "abrasive," but also "extremely charming."[46]  On one occasion, the date of which was not supplied in the record, Mr. Stockdale became upset about being required to travel seven miles to the corporate office to sign an offer package for a potential employee.   He was "very short" with the administrative assistant handling the offer paperwork, and when he had signed the

---

[41]Doc. no. 42 (plaintiff's evidentiary submission), at Exhibit 10; Brown Deposition, Exhibit 34, at H-11.

[42]Brown Deposition, at 182; Miller Deposition, at 35; Lycans Deposition, at 170.

[43]Lycans Deposition, at 169.

[44]*Id.* at 170-71.

[45]Brown Deposition, Exhibit 34, at H-11.

[46]Lycans Deposition, at 59-60; Miller Deposition, at 35; Brown Deposition, at 172.

-17-

papers, he tossed the file toward the assistant's desk.  The file missed the desk and hit the floor, spilling out the contents, but Stockdale "turned around and walked away and was very rude about it."[47]  Lycans informed Stockdale that his behavior was unacceptable.[48]  There is no evidence, however, that Stockdale ever was the subject of an official internal company investigation, or that his employment was terminated.[49]

In August of 2007, Lycans received complaints about a white male manager who reported directly to him.[50]  The manager allegedly had taken credit for another employee's work and inappropriately touched that employee.  Lycans and an investigator from the corporate office investigated the complaint and concluded that the manager had created a work environment that was hostile to the complaining employee.  The manager was reprimanded and sent for training, and his merit increase and discretionary bonus were decreased.[51]

There is no evidence that defendant ever terminated the employment of any other individual who had been designated as "key personnel" on a contract bid.[52]

---

[47]Lycans Deposition, at 57-58.

[48]*Id.* at 58.

[49]Miller Deposition, at 35-36.

[50]Lycans Deposition, at 92, 94, 98.  Counsel directed Lycans not to provide the employee's name during his deposition.  *Id.* at 97-102.

[51]*Id.* at 90-96.

[52]*See* Miller Deposition, at 52-53.

## III. DISCUSSION

In her complaint, plaintiff claims that she was discriminated against on the basis of her race and sex, and with regard to both her pay and the termination of her employment.

### A.     Pay-Related Claims

At summary judgment, plaintiff effectively has abandoned any claim for race or gender discrimination based upon pay discrepancies.  Plaintiff offered no response to defendant's well-supported arguments that summary judgment should be granted on those claims.  Issues and contentions not raised in a party's brief are deemed abandoned.  *See, e.g.*, *Chapman,* 229 F.3d at 1027 ("Parties opposing summary judgment are appropriately charged with the responsibility of marshaling and presenting their evidence before summary judgment is granted, not afterwards."); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (holding that a district court can "properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment") (citing *Lazzara v. Howard A. Esser, Inc.*, 802 F.2d 260, 269 (7th Cir. 1986) (holding that a ground not pressed in opposition to a motion for summary judgment is to be treated by the district court as abandoned)).

In opposing a motion for summary judgment, a party may not rely on his

> pleadings to avoid judgment against him.  There is no burden on the
> district court to distill every potential argument that could be made
> based upon the materials before it on summary judgment.  Rather, the
> onus is upon the parties to formulate arguments; grounds alleged in the
> complaint but not relied upon in summary judgment are deemed
> abandoned.  . . .

*Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (citations

and internal quotation marks omitted).

## B.    Termination Claims

Plaintiff also claims that she was subjected to race- and gender-based

discrimination in the termination of her employment.  Plaintiff does not claim to have

direct evidence of a race- or gender-based discriminatory animus.  Thus, she must

prove her claims with circumstantial evidence, navigating the burden-shifting

framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), and

*Texas Department of Community Affairs v. Burdine,* 450 U.S. 248 (1981).  Under this

analysis, a plaintiff must first establish a *prima facie* case of disparate treatment,

which creates a presumption of discrimination.  To rebut the presumption, the

employer then must articulate a legitimate, nondiscriminatory reason for the disputed

employment action.  If the employer does so, the presumption of discrimination drops

from the case, and the burden shifts back to the plaintiff to show that defendant's

proffered reason is merely a pretext for unlawful discrimination.  *See McDonnell*

*Douglas,* 411 U.S. at 802-05; *Burdine,* 450 U.S. at 252-56.

To establish a *prima facie* case of gender- or race-based discrimination in the termination of employment, plaintiff must show that (1) she is a member of a protected class, (2) her employment was terminated, (3) the employer treated similarly situated employees outside of her protected class more favorably, and (4) plaintiff was qualified to perform the duties of her job. *See, e.g., Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1228 (11th Cir. 2002); *Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001).[53]  Only the third element — whether a similarly situated employee outside plaintiff's protected class was treated more favorably — is in dispute.[54]

---

[53]The elements for a claim of discrimination are the same under both Title VII and § 1981. *See Bass v. Board of County Commissioners,* 256 F.3d 1095, 1109 n.4 (11th Cir. 2001) (quoting *Rice-Lamar v. City of Fort Lauderdale,* 232 F.3d 836, 843 n.11 (11th Cir. 2000) ("The elements of a claim of race discrimination under 42 U.S.C. § 1981 are also the same as a Title VII disparate treatment claim in the employment context.").

[54]Plaintiff, an African-American female, clearly is a member of a class of persons protected by Title VII.  She also is protected by § 1981 due to her race.  Further, the termination of plaintiff's employment clearly was an adverse employment action.  *See Llampallas v. Mini-Circuits Lab, Inc.*, 163 F.3d 1236, 1246 n.18 (11th Cir. 1998) (stating that termination is the "classic and ultimate 'tangible employment action'").  Finally, construing the facts in the light most favorable to plaintiff, she was qualified to perform the duties of her job.  In termination cases — as contrasted to cases involving an employer's failure to hire or promote — the question of whether a plaintiff was qualified to perform the duties of her job often is not an issue.  *See Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001).  The Eleventh Circuit has recognized that, "in cases where a plaintiff has held a position for a significant period of time, qualification for that position sufficient to satisfy the test of a prima facie case can be inferred."  *Rosenfield v. Wellington Leisure Products, Inc.*, 827 F.2d 1493, 1495 n.2 (11th Cir. 1987); *see also Pace v. Southern Railway Sys.*, 701 F.2d 1383, 1386 n.7 (11th Cir. 1983).  Here, due to plaintiff's employment history with defendant, and her designation as a "key manager" on the NASA contract, her qualification for her position can be inferred.

The following is a concise summary of the Eleventh Circuit's guidance on what is required to show that two employees are similarly situated:

> "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1311 (11th Cir.), *opinion modified by* 151 F.3d 1321 (1998) (quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)). "The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed." *Id.* (internal quotations and citations omitted). *We require that the quantity and quality of the comparator's misconduct be nearly identical* to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges. *See Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir. 1989) ("Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples.").

*Maniccia v. Brown*, 171 F.3d 1364, 1368-69 (11th Cir. 1999) (emphasis supplied). Thus, plaintiff must show that employees outside her protected class (white males) were found guilty of the same or "nearly identical" misconduct, yet were disciplined in different ways. *Id.* "Absent some other similarly situated but differently disciplined worker, there can be no disparate treatment." *Abel v. Dubberly,* 210 F.3d 1334, 1339 (11th Cir. 2000).

Where there are clear differences in either the *quantity* or *quality* of the acts of misconduct committed by the plaintiff and her alleged comparators, it cannot be said that they are "nearly identical." *See Silvera v. Orange County School Board*, 244

F.3d 1253, 1259 (11th Cir. 2001) ("[A]lthough Silvera and Ritter have in common the fact that they were arrested in the 1970's . . . Silvera has three additional arrests . . . . The fact that Silvera had multiple arrests is by itself sufficient to establish that he is not similarly situated to Ritter."); *Maniccia*, 171 F.3d at 1368-69 (holding that a female plaintiff in a Title VII sex discrimination case was not similarly situated to male employees who each committed a single policy violation, whereas the female plaintiff had committed at least four policy violations); *Jones*, 137 F.3d at 1312-13 (holding that employees who allegedly committed one act of misconduct were not similarly situated to the plaintiff, who engaged in multiple instances of misconduct in the same day).

Here, the conduct of plaintiff's alleged comparators differs both quantitatively and qualitatively from her own. Plaintiff points to Mike Weibert and Jack Stockdale, both of whom also were listed as "key managers" on the NASA contract, as comparators. The only information in the record regarding potential misconduct by either of these individuals is vague and rather generalized. For example, other employees complained that Weibert and Stockdale were uncooperative, abrasive, aggressive, gruff, and unprofessional. However, there is no evidence as to how frequently those complaints were made, how pervasive the negative opinion about Weibert and Stockdale was in the company, and how much effect (if any) those men's

-23-

attitude had on the reputation of their respective departments or the ability of their employees to do their jobs.  There also is no evidence that either Weibert or Stockdale was responsible for high employee turnover in his department, that either man ever inappropriately touched an employee, or that there were any problems with either man's professional performance. While Stockdale threw a file onto an administrative assistant's desk, there is no evidence that the assistant was injured in the process, or even that Stockdale intended to throw the file *at* the assistant.  Thus, the file-throwing incident cannot be considered materially similar to the incident where plaintiff grabbed another employee's arm, leaving bruises.

In contrast to those generalized, apparently rather isolated, complaints about Weibert and Stockdale, there is clear evidence that plaintiff was the subject of repeated, consistent complaints about her personality and management style, which allegedly had resulted in a general reluctance by employees to work in her department, a reluctance of other employees to utilize the Human Resources Department, and diminished client confidence in the department's performance.  All of these problems are far more significant for a manager of Human Resources (whose job relates directly to employee relations) than for a manager whose job primarily involved safety training (like Weibert) or engineering (like Stockdale).

Plaintiff also points to the unidentified white male manager about whom

Lycans received a complaint in 2007 of inappropriate touching and taking credit for other employees' work. Defendant disputes that this employee is a relevant comparator, because the complaint about the employee was received a*fter* plaintiff's termination. Even disregarding the timing of the complaint, however, this employee cannot be considered a comparator. A single complaint of inappropriate touching and taking credit for other employees' work is not equivalent to the consistent stream of comments that poured in about plaintiff's behavior, especially without any evidence that the other manager's alleged misconduct had any effect on the performance, morale, or reputation of his work group.

In short, plaintiff has not demonstrated that any white male employee engaged in the same or nearly identical conduct as her but was not terminated as a result. As she has not identified a similarly situated comparator outside her protected class(es), she cannot satisfy her *prima facie* case of discrimination based on either race or sex. Accordingly, her discrimination claims must fail.

## C.    Third Party Beneficiary Breach of Contract Claim

The only remaining claim is plaintiff's state law claim for third party beneficiary breach of contract. In cases where the court's jurisdiction is based solely upon a federal question, the district court has discretion to entertain state claims that are supplemental to the federal claim. *See* 28 U.S.C. § 1367(a). The district court

may decline to exercise supplemental jurisdiction when:

> (1)  the claim raises a novel or complex issue of state law,
>
> (2)  the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3)  *the district court has dismissed all claims over which it has original jurisdiction*, or
>
> (4)  in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c) (emphasis supplied).  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Carnegie-Mellon University v. Cohill,* 484 U.S. 343, 350 n.7 (1988).

Here, plaintiff's federal claims have been eliminated.  Accordingly, this court declines supplemental jurisdiction over the remaining state law claim, and exercises its discretion to dismiss that claim.

## IV. CONCLUSION AND ORDER

In accordance with the foregoing, defendant's motion for summary judgment is GRANTED.  Plaintiff's claim for race- and sex-based discrimination pursuant to

-26-

Title VII and § 1981 (Count I of the Complaint) is DISMISSED with prejudice.

Plaintiff's claim for third-party beneficiary breach of contract (Count II of the Complaint) is DISMISSED without prejudice.  The Clerk is directed to close this file.

DONE this 30th day of November, 2009.

United States District Judge